Would you call the first case? Would the lawyers who are going to argue that case please step forward? Good morning, Your Honor. Arthur Hoffman from Plano for PONT. Good morning, Your Honor. Stephen Brogan for Hapelli Metropolitan Life Insurance Company. I'm sorry, Your Honor, I'm not to correct you, but I think it's afternoon. But in any event, welcome. As you both probably know, that microphone does not amplify. It's simply recorded, so please keep your voices up. And I wanted to ask the appellate if you'd like to reserve any of the 20 minutes you have for rebuttal. Yes, Your Honor. I'll take eight minutes. Okay. All right. You may proceed. If you both have 20 minutes, you do not need to use it all. And you can go ahead and sit down. Thank you. May it please the Court. I know that I have struck a nerve with my misrepresentation by half-truth argument because in response to that argument, MetLife has made some material misstatements about the Hyder Court's analysis of a misrepresentation by half-truth claim. In order to understand those misstatements, one must first understand a couple of things about the Hyder opinion. At 245.30265, the Court analyzed Mr. Hyder's misrepresentation by half-truth claim. Four pages later, at page 269, the Court analyzed an entirely separate claim, which was Mr. Hyder's fraudulent concealment claim. And the reason why that's important is that in response to the misrepresentation by half-truth argument in my opening brief, MetLife came back and cited to this Court an argument not from the half-truth section of the Hyder opinion, but from the fraudulent concealment part of the Hyder opinion. In response to my misrepresentation by half-truth argument, MetLife directed this Court to page 269 of the Hyder opinion and made the argument that Hyder stands only for the proposition that silence during a business transaction when accompanied by deceptive conduct resulting in an act of concealment can create a duty to disclose. That argument is simply false and unresponsive to my half-truth argument. Second, in response to my misrepresentation by half-truth argument, MetLife pointed to something that is actually in the Hyder Court's half-truth analysis at page 265. Specifically, MetLife cited Hyder for the proposition that, half the truth may obviously amount to a lie if it is understood to be the whole. The irony of MetLife directing the Court to that quote is that, although that quote does appear in the half-truth part of the Hyder Court's analysis, directing the Court to only that quote is itself a half-truth because it omits the quote that immediately precedes that statement where the Hyder Court said, a statement which is technically true as far as it goes may nonetheless be fraudulent if it is misleading because it does not state matters which materially qualify that statement. That is the test that applies here. You know, while you're on that paragraph, though, the part that the half-truth is that it's true, right? At least half-true. Correct. But that paragraph ends with, we determine that plaintiff sufficiently alleged that defendant made a false statement. And, I mean, this is a case where they say, no problem, right? No problem. But there was a problem. There was a problem because they had reports that said that they had to take remedial steps. They had a report that said you should be taking some remedial steps. So there was a problem, and they said there was no problem. And the Hyder Court finds, I mean, right after what you just read, it says, we determine that plaintiff sufficiently alleged that defendant made a false statement. So that's not half-true. That's false. I think Your Honor is missing the part right above that. Oh, yeah. And you read that accurately. I'm talking about the part that comes after the word here. It says here, although it is true that there was no immediate problem with respect to airborne asbestos contamination, there was the problem of potential release of asbestos into the warehouse. So the court is talking about a potential future problem, not a presently existing problem. And that's the thing with asbestos. As long as it's encased and it's not airborne, there's not a problem. So that was the technically true statement that the defendant made in that case. Is there a problem with the material on the beams? No, there's not a problem. That was a technically true statement because at that point in time, there was no airborne asbestos. Keep reading. Right. This issue was one which the defendant was well aware, since there were recommendations included in the report to enclose material on the columns and to educate employees about working in the vicinity of the material. Right. We determined the plaintiff sufficiently alleged the defendant made a false statement. Not a half-truth, a false statement. I don't think the court is saying it's just an out-and-out misrepresentation. The court is saying that the statement, not a problem, is a technically true statement at that point in time, but it's misleading because unless there's remedial measures taken after that point in time, there's going to be a problem in the future. But I think the implication of Justice Griffin's question and certainly the implication of Heider is that it's a very limited opportunity for a plaintiff to bring a claim based on a half-truth. The facts in Heider were very extreme in the sense that, you know, the plaintiff there had made a very specific inquiry. The facts that were not disclosed were facts that only the company knew. Both of those things are different than your situation, correct? I would say both of those things are different, but neither of those things impacted the court's description of what the test is. Well, what's the test is you read the test in Heider. What do you think the test is? The test is that if you make a statement that is technically true, but you omit qualifying information, in Heider the qualifying information was, yes, technically true today, but unless you take remedial measures in the future, it's not going to remain as not being qualified. That cannot be the test. Anytime you omit qualifying information, it does not become fraud. There has to be something beyond that. It has to do with the materiality of the qualifying information. If I say my name is Mary and I don't say it's Mary Mikva, you know, I just, you know what I'm saying, it matters what that qualifying information is. It certainly must be material. It says that right in the opinion. Okay. So that is the, you know, what's the test? The test is if you omit qualifying? Material qualifying information. And what is material? I'm sorry. How do we determine whether the qualifying information that was omitted is material? Materiality is an issue that courts deal with every day. In fraud cases, in one of the little fraud cases where there was a misrepresentation, there's no fraud unless that statement is material. So that's a question. That's a question of fact for the jury. You're not saying any time we omit anything it's a question of fact for the jury. No, I'm not saying that at all. It must be a material qualifying fact that was omitted. And that's the situation that we have here. We have a situation where in 2004, MetLife is telling potential long-term care customers that your rates could go up. And that's a true statement. But the material qualifying information that they're not telling the consumers are is that as of that point in time, they don't know how to price this stuff. There are five factors that go into the pricing of these things. And two of the five factors, they have no idea what they're doing about these things. They're guessing at these things. And they know that if the pricing factors continue to be out of control, where they can't predict them, there is going to be a time in the future where the rates are going to go up and they might have to go up significantly. And the significance of a rate increase is crucial to this situation because the whole point of long-term care insurance is you're paying money now to protect yourself in the future. Isn't there some disclosure of that in the rider? The rider that had the lost benefits upon lapse? There's no disclosure. To the extent it could go up to 200%? No. That's not a disclosure? There's no disclosure in the rider of any factors that could cause the rates to go up. Not the factors, but the fact. You're not saying the factors, you're saying the fact. I'm saying all that's in that rider is it's telling you that a substantial premium increase means a cumulative increase. So they're presenting a chart here of the possibility of cumulative increases over many, many years from when you first purchased the policy. They're not in any way telling you, hey, this is a risk disclosure that because of X factor or Y factor, your rates could go significantly higher to the point where you're not even shifting the risk to the insurer. You're not saying the insurance company has to disclose how they calculate any rate increases in order to make a full disclosure? That's not what you're saying. No, I'm saying that when an insurance company knows because they've been doing this business for a while that they have no ability to set stable rates. They're having problems with two of these five components that go into pricing these things. They know they're having a problem with it. They know they can't set stable rates. And they know that if the rates don't remain at least stable, yeah, they could go up, but unless the rates remain stable, the insurer is never going to be shifting the risk of this costly future care to the insurer. And that's the whole point of buying this insurance. And so if you're a consumer and you don't know the day you're buying this insurance that it's likely you're never going to shift the risk to the insurer. You're going to be paying this year after year after year after year. And then when you need the insurance, you're not going to be able to afford it anymore. That's a significant material fact that should have been disclosed at the time they sold this policy. And that's exactly the type of material qualifying information that the half-truth doctrine speaks to. The whole idea of material qualifying information is not even limited to this Heider opinion. It was discussed in this Court's W. W. Vincent opinion. It was discussed in the U.S. Supreme Court's universal health opinion. And, again, I go back to the fact that materiality is a concept that trial courts deal with all the time and, yes, it is generally a question of fact. It's not something that should have been the subject of a 2615 motion to dismiss where specific facts are pledged as to why this insurance company knew that it did not have the ability to set stable rates yet it withheld that information from its insurers. Now, defendants are saying, well, okay, even if you've got a valid argument on liability, you've got the file rate doctrine. The problem with their argument there is that I never once asked the trial courts to determine what a reasonable rate is or to in any other way usurp the power of the Department of Insurance. The whole reason I got into the subject that the remedy I'm seeking is disgorgement, which is restitution, was in rebuttal to the trial court telling me, well, if I find liability here, you're going to put me into a situation where I have to calculate damages and I can't calculate damages. The damages are what you pay for the policy. Right. Not what the policy should have cost or I understand what you're saying. Right. And then defendants' other argument about statute of limitations doesn't make sense because the fact that four years into the policy there was an 18 percent increase was not a material event in anybody's life. That didn't indicate to the insured that, oh, I was lied to at the time I bought the house. I want to go back to your first argument, if I can, and I think you're – I think you think and I think your strongest argument, which is – I mean, your – their strongest argument that I'd like you to respond to, which is where do you draw the line? I mean, there's all sorts of things that insurance companies likely know that they don't disclose to their insurance or any purveyor knows that they don't disclose to the consumer, all sorts of things. Where's the line and why do you think it's crossed in this case? I think the line depends largely on the type of insurance product that you're talking about. Here we're talking about a very specific type of insurance product, something that somebody buys like Mr. Dorito when they're in – reaching middle age and they're looking ahead to when they're in old age. This is something I'm going to need in years in the future. And the idea is I'm buying this now and I'm going to make these premium payments every year because I want to shift the risk of this costly future medical care that I'm going to need when I'm in old age. And in that context – and context is always important on the subject of materiality – in that context, how could it be anything but material that the company who's selling that very specific type of insurance knows it does not have the ability to set stable rates? And without stable rates, you're never going to be able to shift the risk from the insurer to the insurer. If a consumer knows that, they're not going to buy that product because that's the whole point of buying the product is to shift the risk at this future point. And what's the half truth that gets told that doesn't include we can't set stable rates? What's the half truth? What do they say that's a half truth if the failure to disclose is that we can't set stable rates? What do they say that's a half truth? They said plaintiff – they told all their customers, they told plaintiff that premiums could be increased over the life of the policy for either of two reasons. One, if plaintiff requested a change to his benefit amounts, or two, pursuant to, open quote, terms of this policy. No specification of what that phrase even meant. There was no disclosure that premiums could be increased even dramatically because we don't know how to set stable rates for this type of product. We know how to set stable rates for life insurance, other types of products. We don't know how to set stable rates for this type of product. And that's why I'm saying on the subject of materiality, context is important. The type of product that's being sold here is important. And with this type of product and the purpose for which somebody's buying it, without disclosing their inability to set stable rates, the people who are purchasing the product in middle age aren't making an informed decision. They're thinking they're shifting the risk of their costly future medical care to somebody else, and they don't know that that's likely never going to happen. They're just going to keep paying year after year after year, and at some point they're going to get clobbered like Mr. Dorito did with a 100% rate increase, and now if they're paying all these years, he can't afford the premium anymore, and the whole point of buying the insurance is lost. Is there some advantage to buying the policy at a younger age than at an older age? Yes, because at a younger age is when you're still earning. I get that, but I mean, I'm 45. I buy this policy because I think that when I'm 65, I may be in a nursing home because I have early onset Alzheimer's. I don't know that, but I think I might. Is my premium going to be different if I'm 45 than if I wait until I'm 55? Absolutely. That's why people try and get this insurance when they're at their prime earning years. Okay, so a younger person is probably going to get a lower premium. Correct. Right? But why would a younger person think that that premium is going to remain stable for the next 20 years? When I say stable, I don't mean identical. I mean there are entirely foreseeable circumstances where there could be rate increases, but what I'm saying, it's not foreseeable that the person who's selling you the insurance doesn't know how to set stable rates, has been in this business for a while, and unlike its other businesses where they're setting stable rates that sometimes go up a little bit over time, they don't have that ability with this type of product. And they're not telling you that. They're not telling you that, oh, our experience with this type of product is different from our experience with life insurance, okay? Yeah, we're an expert in life insurance and we can set stable premiums there, but we don't have the ability to do that here. And you need to know that you're taking on that risk if you buy that product. That's something that these consumers needed to know. Without that disclosure, they're just naturally and I would say reasonably going to presume that the rates, although they may go up, they're going to remain stable. They're not going to be drastically increased. But how do you define stable? Because for four years, things seem to be going along okay, and then he gets an 18% increase. That didn't cause him to feel that the premium was unstable, and then he goes another six years or so and he gets this doubling of his premium. Now, that caused him a little bit of shock. Right, and in the intervening period, they told the Illinois Department of Insurance that they needed to make a 58% increase. And we don't know from the record yet why that increase didn't go through, but prior to the 102% increase, this inability to set stable rates had already revealed itself to MetLife. It just hadn't revealed itself to the customers yet. So what would your position be then at year 10 when they doubled the premium and they put in their – I take it the notification of a possible premium increase occurred in 2004 and never changed throughout the life of the policy? This disclosure that – Correct. Okay, so what if in 2014 when they notified him that the premium was going to double, what if they said, and going forward it looks like, you know, we're going to have substantial increases going forward? What would the position then be? I would say that's too little, too late. It should have been told to the consumer in 2004 because they knew it already then. Why would you withhold that information until you make the 102% rate increase? Is it your contention that they knew in 2004 that let's assume hypothetically the premium was $1,000 a year, that they knew in 2004 when Mr. Dorita was going to be $60,000, $65,000, that the premium would be $8,000 a year? I can't say that they knew that kind of a specific fact, but they knew that two out of the five factors that go into pricing these things, they were having a very difficult time analyzing. Their projections were always wrong. They couldn't get a handle on it. They knew that internally, yet they made no disclosure along the lines of, hey, unlike our life insurance product or some of our other products, we don't have the kind of grasp over that type of data that we, we don't have the grasp of that type of data like for life insurance. We don't have that here with long-term care insurance. We're still learning the game. This is a pretty new product, right? Long-term care, that was a pretty new product, wasn't it? Isn't that what you're saying now, that they didn't have, because the data is still not sufficient to predict the ultimate utilization? I would say it was not a new product. It just wasn't as old of a product as life insurance. They didn't have as many years of experience with that product as they did with life insurance. But that's the problem. They didn't have enough time. Correct. I think if there aren't more questions, you should reserve what time you have. I will reserve.  Good afternoon. May it please the Court. I'd like to begin, if I may, with just a quick summary of the policy language because I believe that Plaintiff's Counsel's treatment of the policy language was not full and complete, and I think the policy language here is particularly relevant. On page one of the policy, the front page, in bold and all-caps letters, the policy states, this policy is guaranteed renewable for life. Premium rates are subject to change. This means you have the right, subject to the terms of the policy, to continue this policy as long as you pay your premiums on time. We cannot change any of the terms of this policy without your consent, except that we may change the premium rates subject to applicable State Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as yours and in the state where this policy was issued. On page 24, which is the page which my colleague here was referring to earlier, it states, we reserve the right to change premium rates on a class basis. The premium will not increase because you get older or your health changes. Your premiums will change if we change your benefit amounts as a result of a request of yours or as a result of an increase as provided under the terms of this policy. And then finally, the provision that Your Honor pointed out earlier is contained in the contingent benefits upon lapse rider. It states on page 2 of that rider, we will provide you with written notice of a substantial premium increase at least 45 days prior to the date on which such premium increase will take effect. What are the terms of the policy they're referring to? Your Honor, the terms of the policy on page 1 define the rights of MetLife to increase premium with the approval of the Department of Insurance. That premium rate increase can only be made on a class-wide basis and cannot be made as a result of an individualized characteristic of the insurance. This provision here is there because it is required to be in the policy by Illinois State law. And it's required to be in the policy under Illinois State law because MetLife has the right, a limited right, to request a premium rate increase in the event that its actual experience differs from its original assumptions. Okay. A couple questions. The rider which you relied heavily on in your briefing has an effective date of 4-21-10 or at least the one attached to the complaint. Was that rider in place from 2004 when he first purchased insurance or do you not know? You know, I actually do not know the answer to that question, Your Honor. Okay. I'm not certain, but it's our position that the policy language here disclosed to Mr. Dorito the very harm that he alleges he suffered, which is the 102 percent rate increase. It's implausible in our view that an insurer could read a policy such as this one and think that MetLife would not exercise its right to increase premium if necessary. He's not arguing that you had no right to exercise or you didn't tell him to exercise. What he's saying is you didn't disclose how little you understood that product and how volatile it was going to be. That's what you didn't disclose. That's correct, Your Honor. The information that Plaintiff alleges ought to have been disclosed is that MetLife did not have the ability or it knew that it did not have the ability to set what Plaintiff is describing as stable premiums. And, in fact, that's what you told the Department of Insurance when you asked for a rate, right, when you asked for an increase. Although a larger premium rate increase is currently supportable under loss ratio regulation and needed under rate stability regulation to minimize impact to policy owners, you're not going to set it because that's going to get everybody really upset and they'll probably cancel their policies. I paraphrase the end of it. It was MetLife's position at the time that it was in the best interest of policyholders to request an 18 percent rate increase based on the experience that it observed from the time that it originally priced these policies. It's not in the record, but this policy was originally priced in 2002. And so as the claims experience developed and as MetLife's experience with long-term care insurance developed, it had claims experience that was related to the specific product and could therefore adjust its premium rates based on those actual claims experience. But it kind of acknowledged when you asked for that rate increase that it wasn't enough, right? Didn't you? Isn't that what you're saying? What we're asking for isn't as much as we really need it to be. Under the loss ratio regulations, which is under profit loss ratio regulations, it's a 60-40 split. And what MetLife was stating to the Department of Insurance is that if it wanted to maintain that 60-40 split between premium dollars coming in and claims going out, then it would need a rate increase larger than 18 percent. It was saying that it was supportable to request a larger rate increase. It wasn't saying that it would request one. It wasn't saying that if it requested one that the department would approve it. It was simply providing the regulator with the information that it's required to provide the regulator in connection with the premium rate filing. I take it this information is not provided at the same time to the policyholders, that it's provided to the regulators. I believe Your Honor's question is when a long-term care insurer requests a premium rate increase, it does not at the time of the request send a notice to its policyholders to let them know that they're in the process of evaluating their rates and seeking a rate increase request. Nor does it disclose the contents of this letter at any point to its policyholders, correct? That's correct. That's correct. What does it mean to close the policy? When an insurer closes a policy block, it stops selling that particular policy form. So to close the block means that MetLife has made the decision to stop selling that particular policy form. So if I had been a 10-year customer buying that policy, now you've closed the policy, what do I have in the 11th year? The policies are still honored, Your Honor. The policies that have been sold remain in the existing block. What it means is that no additional insurance will be offered and sold. So a company needs a lot of customers in order to get premiums to cover the liability that's going to occur under these policies, right? So if you stop selling that product in the future, you're freezing the amount of premium payers that you have and are in all likelihood going to increase rates to a point where those premium payers won't be able to afford it because they're the only ones contributing to the pool. That theory is described by the plaintiff's bar as the death spiral theory, and we would dispute the fact that closing a block would necessarily result in... What's the result? How do you keep the premiums to a point where people can afford them and not be driven out because they're unaffordable, because there's not enough people buying that product? MetLife, from a pricing perspective, an actuarial perspective, MetLife would not use premium dollars from a new insurance sale to fund expected claims dollars for a previous insurance sale. They price the product such that the premiums as a whole would support the claims that are expected from that block, but it's not necessarily true that you would need additional premium dollars to continuously flow into an insurance block in order to fund the expected claim amounts because otherwise the folks at the end of the... It would be like a Ponzi scheme then, right? You don't need to keep selling. That's what my question is. That's factually inaccurate, right? It's not in the record, but that's the plaintiff's bar's theory is that by closing the block, it necessarily meant that it would need to exponentially request higher and higher premiums, and that's not the case. The block is intended to be sustainable based on the claim. Well, in this case, looking forward, he gets a 100% increase, 108% increase. What would the customer look for two years from now, three years from now? If the block is now closed, could he reasonably expect another 100% increase in a couple years so that by the time he's 65, he's paying five times more than he thought he was paying back in 2004? No. The rate regulations require that a long-term care insurer certify that the premium rate increase request is sufficient to sustain the block of insurance under moderately adverse experience. So in 2014, when they requested the 102% rate increase, they had actually originally requested 58%, but again told the Department of Insurance that they would not be able to make that certification if they received an approval at 58%. We believe it's implied from the record, and it's a matter of public record, that the 102% approval was consistent with the rate regulations, and the reason that MetLife did not receive approval for the 58% rate increase is because the Department of Insurance asked MetLife to make the certification and to request the amount that it needed to do so. In other words, rather than request 58%, the department came back to MetLife and said, you cannot have 58% because you've told us that you need more in order to certify that the rates would be sustainable under moderately adverse experience. Tell us what you need, and we'll approve that rate, and that's why they have a 102% rate increase here. So MetLife would still have the right if its experience developed further and worsened. So wouldn't their experience develop further to be an adverse experience if they have less people in the pool because they've closed the product? No, that's not necessary. From an actuarial standpoint, that's not necessarily true. In the rate regulations, an insurer, for example, is not allowed to use new claims dollars to fund prior losses. In other words, it can't try and catch up with premium dollars. So the regulators would not permit that type of activity. They would not permit a rate increase that was intended to make up for prior losses. So it's not necessary that you have an open block in order to have a sustainable block. Is there any disclosure to the consumers of the blocking of the policy? I'm sorry? Is there any disclosure to the consumers, like Mr. Del Vito, that this policy was no longer being sold? No, MetLife did not make... And was there any disclosure of the requested rate increase that was turned down to 58%? Was there any disclosure of that? No. Under Illinois law, an insurer is required to first notify the Department of Insurance before it notifies the policyholders of an expected premium rate increase. Right. But once it was turned down by the Department of Insurance, there was still no disclosure to the consumers that, hey, we applied for a rate increase and it was turned down by the Department of Insurance, and here's why. None of that is disclosed. A long-term care insurer normally would not disclose a rejected rate filing. There are times when a regulator would refuse a rate increase outright or would cap a rate increase, and those details of the rate filing would not be disclosed. In this instance, it's not a fact that's in the record, but it was more of a back and forth where the original filing was 58% and the insurer worked with the Department of Insurance until they arrived at the 102%.  So it wasn't, I think, an ongoing process that ultimately resulted in a rate increase that was approved. Right. And it's, I know it's not as helpful to have facts that are not in the record, but as a factional matter, the Department also asked MetLife to refrain from requesting further rate increases for seven years. And so to answer your honest questions, It's not going up for seven years. MetLife cannot request another rate increase after that 102% rate increase for another seven years because of the Department of Insurance requests. Can I ask a question about the Kaiser report? Certainly. You say that it was publicly available. On what do you base that? Well, the Kaiser report was published online, I believe. And so if one were to Google long-term care insurance rates, you can find the Kaiser report online in that manner. Would the decision to block the policy be publicly available? Is that something that would be available online? The decision to close the policy? To block the policy, MetLife's decision. We're blocking this policy. We're not selling it anymore. Would that be? That's publicly available in the sense that any consumer can go to the Illinois Department of Insurance website and pull these filings down and view them. And so the letter that was found by plaintiff and attached to the complaint is one that was publicly available. And of course, you could always call the Department of Insurance and request that information. Or even MetLife. You could call MetLife and say, I like this policy so much, I want more of them for every study I'm related to. That's correct. You could call MetLife and ask the question. But the important issue here is that an insurer does not have a fiduciary duty as a matter of law to disclose all material facts to its insurers. That's a set. And I think the plaintiff is right. You're sort of combining those two arguments, two claims. That's two separate claims. One is they're saying you did have a fiduciary, a special duty in this situation. And then they're saying even if you didn't, I think that's what they're saying, even if you didn't, because you told us a half-truth, even if you had no special relationship to us, it was so misleading what you said to us because of the omission of what you didn't say. Right. And those are two separate potential claims. That's correct. And we believe the first claim fails because the only experience that's noted by plaintiff is related to the experience of actuarial science and underwriting. And if that experience were sufficient to create a duty as a matter of law, a relationship of superiority and influence, it would destroy the underlying principle, which is well established that an insurer does not owe its insurers a fiduciary duty. And the second claim, this Heider half-truth claim, we believe you ought to ask the question of what the standard is. And I think the standard that is missing from plaintiff's briefing is that the half-truth needs to be rendered misleading by the omitted materials. And here what we have, the half-truth that plaintiff relies on, is a contract that states that MetLife has the right to increase premium, and that premium increase might be substantial. It's not a misleading statement to say that MetLife has the right to increase premium because it's a statement that's required by law consistent with MetLife's rights under the contract. Their complaint, though, alleges that this 2003 report states that the ability to, and I don't mean to be precise here, but the ability to determine an appropriate premium is weaker than normal. And now this is the allegation of the complaint, and that you knew that. And this is a 615. We're getting into a lot of things that are way beyond the complaint here. And in the 615, you know, the reasonable inferences are that go in favor of the pleader. So wouldn't a reasonable inference be based on this, because this is a bit unusual. We don't have the facts, according to this report, which was issued a year before the policy. We don't have the basis to set a stable, and we should just disclose that. Just disclose that. You know, I mean, whatever. That's the disclosure they're looking for is right from the 2003 report. Right, and it's our contention, Your Honor, that the contract language here would have to be misleading in order for the duty to disclose to emerge. And the contract language here states that MetLife can change premium rates, it has the right to do so, and that the premium rate increase might be substantial. It does not report to provide information related to the nature of any rate increase, the size of any rate increase. It simply reserves MetLife's right to request a rate increase with the approval of the Department of Insurance. And if that contract language were sufficient to trigger a duty obligation on the part of MetLife, then every long-term care insurer in the country would have a duty to disclose details about its actual pricing. I don't know if they're saying they want details. They're just saying they should know that you don't have the confidence that you have in other types of insurance. But in order to make that disclosure, I mean, it's the disclosure they're looking for is really an opinion as to whether or not someone is capable of pricing persistency and lapse. And these are actuary details that are proprietary and confidential with respect to the pricing of a long-term care insurance product. To find that an insurer would have a duty to disclose in that situation would, I believe, create a much broader duty that is currently supported by Illinois law. Well, just one last thing. Like Heider, there was a report that the defendant had saying that remedial things were necessary. And here there's a report. This isn't just one that's standing out there alone. We're trying to figure this out. There's a report that says there's a difficulty in setting these premiums based on a lack of sufficient data, I'll say. Shouldn't that be disclosed? And that's what the complaint alleges. And then if you take the reasonable inferences, like I say. Well, I don't believe so, Your Honor. And I believe it's because under Heider and under the other cases like Mitchell where they address the half-truth standard, there's something much more than a possibility of a difficulty pricing insurance. In Heider, you had the situation where a seller's agent told the plaintiff that there was not a problem with asbestos that was on pipes when they had knowledge that there were costly remediation pairs that were then immediately necessary in order to avoid liability, environmental liability. And that's not what we have here in this 2003 report. The 2003 report acknowledges a general difficulty that the insurance industry is having. It does not rise to the level of fraud in our view. And then finally, the plaintiff touched briefly on the foul rate doctrine, and it is our position that although the remedy sought is not recovery of the difference between the rate charged and a reasonable one, it would be necessary for the court to determine whether or not the premium rate increase was sudden or drastic or stable as plaintiff described in order to make the plaintiff's claim. And that's an assessment that I believe the court is not permitted. He's not really challenging the reasonableness of the rates. He's challenging what you disclose. The disclosure. And that's what it seems. I mean, there is a difference. Anyway, if there's nothing else, I think we can just briefly hear from the plaintiff. Thank you, Your Honor. Thank you. Just two quick points to follow up on Justice Griffin's comments. The plaintiff has not alleged that they were entitled to disclosure of proprietary actuarial data. The key allegation about what should have been disclosed is in paragraph 12 of the proposed amended complaint. It says, the authors of the March 2003 Kaiser report concluded that insurer estimates in the first two areas, persistency and utilization, have proved especially problematic because of the short history and rapid evolution of the long-term care industry. So it's a much more general, we're having problems with this particular product. And counsel's suggestion that consumers should have known about this report because they could have just Googled it. This was not 2018. This was 2003. People were not just Googling as part of their everyday life. It would be ridiculous to think that a consumer should be expected to search out some Georgetown University study. That's all I have. Thank you. Thank you, counsel. Thank you, both of you. It was very well briefed, and you will hear from us shortly. Well briefed, well argued.